IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | Criminal Action No. 1:25-cr-300 (RDA) |
| | ) | |
| JAMON KANEE MURPHY, | ) | |
| | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION AND ORDER**

This matter comes before the Court on Defendant Jamon Kanee Murphy's ("Defendant") Motion to Suppress All Evidence from Warrantless Search and Arrest ("Motion") (Dkt. 45). Considering the Motion together with the Government's Opposition (Dkt. 61), the argument heard and evidence presented at the July 22, 2026 hearing, and the supplemental brief submitted by Defendant (Dkt. 71), the Court DENIES the Motion for the reasons that follow.

### I. BACKGROUND

#### A. Factual Background

At approximately 7:29 p.m. on April 2, 2025, Prince William County Police Department ("PWCPD") dispatchers received a 911 call from a citizen reporting suspicious activity occurring in the parking lot of a tobacco store located near Sudley Road in Manassas, Virginia. Dkt. 45 at 1-2; Dkt. 61 at 2. At the hearing, PWCPD Detectives Jeremy Booth and Eliann Rivera Diaz testified that this area is known to the PWCPD as a high crime area. The caller stated that she and her husband had seen a man wearing a mask put what appeared to be a firearm into his pocket. Govt. Exh. A at 0:10-0:30.[1] She contemporaneously described the masked man as "going through the trunk" of a

---

[1] Government Exhibits A, B, and C (the 911 call and body camera footage) were submitted via CD as part of the Government's response to the Motion to Suppress and were admitted as evidence during the July 22, 2026 hearing. Government Exhibit D was also admitted during the hearing and is available on the docket as docket entry 61-1.

black Audi sedan and read the license plate number of the vehicle to the dispatcher. *Id.* at 0:45-1:30. The caller further described the ethnicity and clothing of various individuals inside the vehicle while detailing their comings and goings. *Id*. at 1:30-4:30.

At approximately 7:37 p.m., PWCPD officers, including Detectives Booth and Rivera Diaz, arrived on the scene. Govt. Exh. B at 1:55. Detective Booth immediately observed a black Audi vehicle matching that reported by the caller and approached its open rear right passenger door. *Id*. at 2:00-2:10. Detective Booth testified that he further observed that the license plate matched the plate number reported by the 911 caller. As he approached the vehicle, Detective Booth encountered a heavily intoxicated, masked individual sitting next to an empty beverage container. *Id.* at 2:05. Detective Booth asked that the passenger provide his identification, whereupon the passenger began to fumble around the passenger door compartment. *Id.* at 2:15-2:35. Located in this compartment was a switchblade knife and a pair of scissors, both of which Detective Booth removed and placed atop the vehicle. *Id.* Given the 911 caller's reports of a firearm as well as the observable weapons by the passenger, Detective Booth testified that there was an officer safety concern. The passenger continued to fumble around the vehicle and failed to follow Detective Booth's directives, at which point Detective Booth asked the passenger to step out of the vehicle. *Id.* at 2:30-3:45. At the hearing, Detective Booth testified that during this encounter he observed several violations of the law, including: (i) the wearing of the mask in public; (ii) public intoxication; and (iii) illegal tint on the vehicle's windows.

While Detective Booth was speaking with the passenger, officers, including Detective Rivera Diaz, approached the vehicle from the driver's side. Govt. Exh. C at 2:30. At the hearing, Detective Rivera Diaz testified that she immediately recognized the window tint of the vehicle to be illegal in the Commonwealth of Virginia based upon her training and experience as a PWCPD officer. Unable to see inside the vehicle due to the tint, Detective Diaz twice tapped on the driver's side window to

2

ask that the driver roll down the window. *Id.* at 2:30-2:45. The driver refused to do so. *Id.* The rear left passenger then rolled down her window, at which point Detective Diaz was able to shine her flashlight through the cab toward the driver. *Id.* at 2:50-3:05. From this vantage point, Detective Diaz observed the driver reaching underneath his seat and making furtive movements around his clothing pockets. *Id.* Officers subsequently drew their firearms and shouted for the driver to stop reaching and put the car in park. *Id.* at 3:00-3:15.

An officer then ordered that all individuals exit the vehicle with their hands raised. *Id.* at 3:10. Soon after, the individual in the front passenger seat of the vehicle fled the scene while holding on to his waistband with one hand. Govt. Exh. B at 3:45. Detectives Booth and Rivera Diaz both testified that this behavior is often displayed by individuals concealing firearms on their person.

Officers then detained and searched each occupant of the vehicle. *Id*. at 3:50-11:20; Govt. Exh. C at 3:15-3:55. After additional officers arrived, Detective Booth began to search the vehicle for weapons, moving from the back passenger areas to the driver's area. Govt. Exh. B at 11:30-12:30. Underneath the driver's seat, Detective Booth discovered a firearm with the grip side pointing toward the front of the vehicle. *Id.* at 12:50-13:20; Dkt. 61-1 (Govt. Exh. D). Detective Booth testified that the handgun's positioning indicated it had been quickly placed underneath the car seat. Detective Booth also found a small bag of white powder next to the firearm, and subsequently placed Defendant under arrest. *Id*.

### B. Procedural Background

On November 4, 2025, a grand jury empaneled in the Eastern District of Virginia returned an indictment charging Defendant with (1) conspiracy to distribution 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, in violation of 21 U.S.C. §§ 841(a)(1) and 846, and (2) felon in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). Dkt. 21. On

March 9, 2026, Defendant filed a number of motions,[2] including his Motion to Suppress (Dkt. 45). Thereafter, on May 15, 2026, the Government filed its Opposition. Dkt. 61. On July 22, 2026, the Court heard argument and took evidence on Defendant's Motion to Suppress. On July 24, 2026, Defendant submitted a supplemental brief. Dkt. 71.

## II. LEGAL STANDARD

The Fourth Amendment to the United States Constitution prohibits "unreasonable searches and seizures." U.S. Const. amend. IV. However, "not every police-citizen encounter will implicate this prohibition." *United States v. Cloud*, 994 F.3d 233, 241 (4th Cir. 2021) (citing *United States v. Stover*, 808 F.3d 991, 995 (4th Cir. 2015)). Thus, "a seizure does not occur simply because a police officer approaches an individual and asks a few questions." *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Yet even encounters that "start out as constitutional may . . . at some unspecified point, cross the line and become an unconstitutional seizure." *United States v. Weaver*, 282 F.3d 302, 309 (4th Cir. 2002). In identifying the point at which a person is "seized" within the meaning of the Fourth Amendment, courts in this Circuit ask whether, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Gray*, 883 F.2d 320, 322 (4th Cir. 1989) (quoting *United States v. Mendenhall*, 446 U.S. 544, 544 (1980) (plurality opinion)).

But even if an individual is "seized" for the purposes of the Fourth Amendment, that seizure does not automatically become "unreasonable." Where a police officer has reasonable suspicion to believe that criminal activity "may be afoot" and that the persons with whom they are dealing may be "armed and presently dangerous," the police officer is entitled to initiate a brief investigatory detention to search for weapons. *Terry v. Ohio*, 392 U.S. 1, 30 (1968). This "reasonable suspicion"

---

[2] Defendant's other motions are addressed by separate order.

exists "when law enforcement officers possess 'a particularized and objective basis for suspecting the person stopped of criminal activity.'" *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) (quoting *Ornelas v. United States*, 517 U.S. 689, 696 (1996)).

## II. ANALYSIS

In his Motion to Suppress, Defendant argues that he was seized without probable cause or reasonable suspicion when police approached his vehicle.[3] Dkt. 45 at 3-4.  He states that the officers were acting only on a vague and uncorroborated report of a suspicious person, which falls short of the reasonable suspicion necessary to sustain an investigatory stop.  In response, the Government contends that the vehicle passengers were not seized until Detective Booth instructed a vehicle occupant to remain in the vehicle and keep his hands visible.  Dkt. 61 at 9-10.  The Government posits that, by that point, PWCPD officers had reasonable suspicion to both detain the occupants and search the contents of the vehicle.  Dkt. 61 at 9-13.

The Court finds that, considering the totality of the circumstances surrounding the encounter: (1) Defendant was "seized" for the purposes of the Fourth Amendment at the point a PWCPD officer demanded that the occupants exit the vehicle with their hands raised; (2) that at this point PWCPD officers possessed reasonable suspicion both that the occupants of the vehicle may be armed and dangerous; (3) that at this point officers possessed reasonable suspicion of crimes that had been committed (related to the window tint, illegal mask, and public intoxication); and (4) that PWCPD officers' subsequent search of Defendant's vehicle was supported by reasonable suspicion of a

---

[3] It is unclear when exactly Defendant argues he was seized.  In his Motion, Defendant states that "the affidavit identifies no criminal activity whatsoever when officers approached the vehicle," thereby indicating that Defendant believes to have been seized immediately after PWCPD officers arrived on the scene.  Dkt. 45 at 3.  But as courts, including the Supreme Court, have long recognized, "police presence does not, standing alone, constitute a seizure." *Michigan v. Chesternut*, 486 U.S. 567, 575 (1988); *see also Florida v. Royer*, 460 U.S. 491, 497 (1983) ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in

danger to officer safety and of a crime that might be in progress (given the 911 tip, the furtive movements, the flight, the visible weapons, the window tint, and the illegal mask). Each issue is addressed in turn.

A. Seizure of Defendant

To ascertain the constitutionality of the seizure of Defendant and the subsequent search of his vehicle, the specific point at which Defendant was seized must first be identified. In determining whether a reasonable person would feel free to cease an encounter with a police officer such that one cannot be said to have been seized, courts in this Circuit consider:

> (i) the number of police officers present; (ii) whether the police officers were in uniform; (iii) whether the police officers displayed their weapons; (iv) whether they touched the defendant or made any attempt to physically block his departure or restrain his movement; (v) the use of language or tone of voice indicating that compliance with the officer's request might be compelled; (vi) whether the officers informed the defendant that they suspected him of illegal activity rather than treating the encounter as routine in nature; and (vii) whether, if the officer requested from the defendant . . . some form of official identification, the officer promptly returned it.

*United States v. Peters*, 60 F.4th 855, 862-63 (4th Cir. 2023).

An analysis of these factors reveals that Defendant is mistaken in arguing that he was seized at the point that officers approached his vehicle. Detectives Booth and Rivera Diaz's body worn camera footage reveals that police vehicles parked adjacent to Defendant's vehicle as they arrived on scene. Govt. Exh. B at 2:00-2:10; Govt. Exh. C at 2:00-2:30. Detective Booth testified at the hearing that PWCPD police officers specifically parked their vehicles in such a way as to avoid blocking Defendant's exit. After arriving on the scene, Detective Booth calmly approached Defendant's vehicle and greeted one of its occupants by asking "what's going on?" Govt. Exh. B at 2:00-2:05. Because Defendant's vehicle was not blocked in, PWCPD officers' actions in these circumstances are unlike those in which courts have found a Defendant to have been seized.

---

another public place . . . ."). Thus, Defendant was not seized immediately upon arrival of police

*Contrast Royer*, 460 U.S. at 497 ("[L]aw enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place . . . .") *with United States v. Jones*, 678 F.3d 293, 300-03 (4th Cir. 2012) (finding that blocking a defendant's car from exiting a one-way roadway and immediately requesting that a defendant lift his shirt and consent to a pat down constituted a seizure); *Stover*, 808 F.3d 997-98 (holding that a defendant was seized when officers blocked defendant's vehicle with a patrol car, trained a spotlight on defendant's vehicle, and drew weapons).

The Court further finds that Defendant was not seized during Detective Booth's interactions with the passenger located in the rear right seat of Defendant's vehicle. Detective Booth's body worn camera footage shows an interaction that begins with Detective Booth approaching an already open car door to inform a passenger that wearing a mask in Virginia is unlawful. Govt. Exh. B at 2:00-2:10. While Detective Booth was in uniform and used language indicating that he suspected the passenger was engaged in illegal activity, Detective Booth neither displayed his weapon nor attempted to block or restrain the passenger's departure. *Id.* Furthermore, at this point, Detective Booth's suspicions centered on the passenger he was questioning rather than the Defendant. Therefore, even Detective Booth's inquiries as to Defendant's passenger could not have indicated to Defendant that he was not free to depart the scene. This initial interaction is thus more properly described as an ordinary police-citizen encounter than a seizure, and it is "axiomatic that police may approach an individual on a public street and ask questions without implicating the Fourth Amendment's protections." *Weaver*, 282 F.3d at 309.

---

officers.

Defendant was not seized until a PWCPD officer shouted at the occupants to exit the vehicle with their hands raised.[4]  Govt. Exh. C at 3:10.  At that point, a number of uniformed police officers had surrounded the vehicle, displayed their weapons at Defendant, used language indicating that compliance with their requests was compelled, questioned Defendant in such a way as to indicate that he was under investigation, and used language indicating that Defendant's freedom of movement was being curtailed through lawful authority.  *See Peters*, 60 F.4th at 862-63 (listing these factors as indicative of a seizure).  The totality of the circumstances thus demonstrates that a reasonable person, measured objectively from an innocent citizen's perspective, "would have believed that he was not free to leave" at this point of the encounter.  *Mendenhall*, 446 U.S. at 554.

## B. Reasonable Suspicion

It next must be ascertained whether PWCPD officers possessed the requisite reasonable suspicion at the time that they seized Defendant.  In this inquiry, several factors may "be taken together to create a reasonable suspicion even where each factor, taken alone, would be insufficient." *United States v. George*, 732 F.3d 296, 300 (4th Cir. 2013).  The Government argues that this standard is satisfied: there existed a detailed tip providing contemporaneous personal observation of suspicious activity, officers corroborated portions of this tip, an occupant of Defendant's vehicle reached in the direction of weapons when asked to produce identification, the Defendant reached underneath his seat when told to keep his hands visible, and the brake lights of the car suggested that the car was in reverse. Dkt. 61 at 10-11.  At the hearing, the Detectives added that the passenger was

---

[4] The Government locates an earlier moment in time as "the earliest 'seizure' point," that being when Detective Booth ordered "occupants to remain in the vehicle." Dkt. 61 at 9.  A review of Detective Booth's body worn camera footage reveals that this statement was directed to a singular occupant rather than all occupants as the Government alleges. *See* Govt. Exh. B at 2:45-2:55.  In any event, whether Defendant was seized at this earlier point or at the later point identified by the Court is of no moment because at either point law enforcement has: (i) confirmed the information relayed on the 911 call; (ii) identified three possible violations of law (illegal tint, public intoxication, and

illegally wearing a mask in public, that the windows appeared illegally tinted, and that the passenger appeared to be illegally drunk in public.

When understood in combination, these factors support a determination that reasonable suspicion existed at the time that Defendant was seized. The 911 caller reported having seen a man wearing a mask place a firearm into his pocket and proceeded to contemporaneously describe the scene that police officers subsequently encountered. Govt. Exh. A; Dkt. 61 at 10-11. This contemporaneous description of the scene "enhance[s] the tip's reliability." *United States v. Perkins*, 363 F.3d 317, 322 (4th Cir. 2004). What is more, the tip detailed the license plate number of Defendant's vehicle and the clothing of its occupants, information that Detectives Booth and Rivera Diaz testified was subsequently corroborated by officers on scene. *See Perkins*, 363 F.3d at 324 (describing how similar corroboration indicated increased reliability).

After approaching Defendant's vehicle, Detective Booth encountered an uncooperative and seemingly highly intoxicated occupant wearing a mask in violation of Virginia Code § 18.2-422. Govt. Exh. B at 2:15-2:35. Detective Booth testified that he immediately recognized this individual to be violating Virginia Code. Furthermore, this individual repeatedly fumbled toward an open knife and a pair of scissors, thus confirming to the officers present that weapons were contained within the vehicle. *Id.* at 2:15-2:35.

As the encounter progressed, unlawful activity and threats to officer safety continued to present themselves. Detective Rivera Diaz testified at the hearing that immediately upon her arrival she recognized the window tint of the vehicle as illegal. Upon shining a flashlight into the vehicle, Detective Rivera Diaz observed the Defendant make furtive hand movements around his car seat and clothing pockets. Govt. Exh. B at 2:50-3:05. These movements indicated to PWCPD officers that

---

wearing a mask in public); and (iii) identified an officer safety issue related to the knives, scissors, and occupant's furtive movements within the vehicle.

Defendant might be armed and dangerous, thus further supporting a determination of reasonable suspicion. *See United States v. Davis*, 742 F. App'x 714, 716 (4th Cir. 2018) (finding that furtive hand movements inside the cabin of a vehicle lent support to a finding of reasonable suspicion); *United States v. Spearman*, 254 Fed. App'x. 178, 182 (4th Cir. 2007) (finding that reaching under a car seat created heightened tension and supported a finding of reasonable suspicion). Additionally, Defendant repeatedly refused to obey officers' requests that he place his vehicle in park and cease his furtive hand movements. Govt. Exh. C at 2:30-3:15.

Under the totality of the circumstances underlying the encounter, PWCPD officers therefore possessed reasonable suspicion both that criminal activity was occurring and that the occupants of the vehicle might be armed and dangerous, thereby justifying the seizure, and pat-down search, of Defendant.

### C. Search of Defendant's Vehicle

Considering that officers were justified in briefly seizing Defendant for the purpose of patting him down for potential weapons, they were also justified in briefly searching Defendant's vehicle for the same. Defendant argues that this warrantless search was "not justified by any recognized exception," and that officers lacked probable cause to believe that Defendant possessed a firearm. Dkt. 45 at 4. However, Defendant sets forth the wrong legal standard. It has long been established that "the search of the passenger compartment of an automobile . . . is permissible if the police officer possesses a reasonable belief . . . the suspect is dangerous and the suspect may gain immediate control of weapons." *Michigan v. Long*, 463 U.S. 1032, 1049 (1983). Regardless of the extent to which suspects are in control by police, "the search of [a] car [is] a reasonable measure to protect the safety of the officers conducing the stop" if "after their release at the conclusion of the stop, the suspects would have access to the interior of their car." *United States v. Holmes*, 376 F.3d 270, 279-80 (4th Cir. 2004).

At the time that Detective Booth undertook a search of Defendant's vehicle, the reasonable suspicion previously discussed had only been strengthened by a passenger's flight from the vehicle whilst clutching his waistband.  Govt. Exh. B at 3:45.  Both Detectives Booth and Rivera Diaz testified that, in their experience, such an action indicates that an individual is gripping a firearm contained within their waistband.  Considering this information together with the weapons already discovered in the vehicle, the 911 call reporting a firearm, and the behavior of the vehicle's occupants (including the furtive movements of Defendant), Detective Booth possessed a reasonable belief that the occupants were dangerous and could gain immediate control of weapons at the point of their release.

Furthermore, Detective Booth's search of Defendant's vehicle did not exceed the scope of his lawful authority.  The body worn camera footage, *see* Govt. Exh. B at 11:15-13:20, demonstrates that Detective Booth limited his search to "the entire passenger compartment of that vehicle where weapons could be found, including . . . 'containers' like the center console and glove compartment." *Holmes,* 376 F.3d at 281 (citing *United States v. Milton*, 52 F.3d 78, 80 (4th Cir. 1995)).  Indeed, Detective Booth ultimately discovered the firearm and suspected narcotics at issue in this Motion underneath the driver's side seat.  Govt. Exh. B at 12:50-13:20; Dkt. 61-1 (Govt. Exh. D).

This case appears almost exactly on all fours with the Fourth Circuit's decision in *United States v. Griffin*, 589 F.3d 148 (4th Cir. 2009).  In *Griffin*, the Fourth Circuit held that officers who made a *Terry* stop were justified under *Long* to conduct a protective search of defendant's vehicle. *Id.* at 150.  The *Griffin* Court noted that an informant had told police that an occupant of the vehicle had a gun, the officers initiated a stop under *Terry*, frisked the defendant, and, out of concern for officer safety, handcuffed the defendant and put him the back of a police car. *Id.*  Thereafter, the officers searched the passenger compartment of the defendant's vehicle and found a pistol on the driver's side floorboard and the defendant was arrested. *Id.* at 151.  The Fourth Circuit affirmed the

denial of suppression under the "second prong" of *Long*, "concerning the possibility that the suspect might gain immediate control of any weapons inside the vehicle" if he was not arrested. *Id.* at 154. Following *Griffin*, district courts in this Circuit have upheld searches in the same circumstances. *See United States v. Fallin*, 2026 WL 1693595, at * 36 (D. Md. June 11, 2026) (denying suppression where there was reason to believe that defendant possessed a gun, no gun was found on a frisk, and there was reason to believe there was a gun in the car given that he was "moving about and reaching back" as officers approached); *United States v. Clark*, 687 F. Supp. 3d 721, 746-47 (E.D. Va. 2023) (similar).[5]

Here, at the point that the vehicle was searched, nothing Defendant is alleged to have done would have resulted in his arrest. Accordingly, after the pat-down search, Defendant would have been released to return to his vehicle. Given the 911 tip, Defendant's furtive movements, and the weapons already located within the car, the officers were entitled under *Holmes*, *Griffin*, and other *Long* progeny to conduct a search of the vehicle to which Defendant would be returned to ensure that there would be no weapon within reach upon his return.

---

[5] Defendant cites *United States v. Davis*, 997 F.3d 191 (4th Cir. 2021), for the proposition that law enforcement officers are not permitted to search a vehicle where a suspect is restrained and there is no immediate danger of the individual obtaining a weapon from the vehicle. But *Davis* did not address the concern upon which the *Holmes* and *Griffin* Courts relied, namely the concern that when an individual is returned to the vehicle they would have access to a weapon and could present a danger. Indeed, *Davis* examined a "search-incident-to-arrest," but here there was no basis to arrest Defendant until after the search was conducted and thus Defendant would have been returned to the vehicle – and the gun. *Holmes* and *Griffin* are binding, published decisions of the Fourth Circuit that speak directly to the scenario presented here – that is a search for officer safety where there is a likelihood of a firearm in the vehicle and Defendant is going to be returned to the vehicle. Moreover, even under *Davis*, an officer may conduct a search for evidence of a crime or contraband. *See Davis*, 997 F.3d at 200-01 ("Under the automobile exception, the police can search a vehicle without first obtaining a warrant if the vehicle 'is readily mobile and probable cause exists to believe it contains contraband.'"). Here, such cause existed, given the corroborated 911 tip, the masked passenger, the weapons present in the vehicle, the fleeing passenger, the high-crime area, the furtive movements of Defendant, and the illegally tinted windows.

IV. CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Suppress (Dkt. 45) is DENIED.

The Clerk is directed to forward copies of this Memorandum Opinion and Order to counsel of record.

It is SO ORDERED.

Alexandria, Virginia
July 24, 2026

_____/s/_____
Rossie D. Alston, Jr.
United States District Judge